UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-61894-CIV-ALTMAN

**MICHAEL DAVID MARTINEZ**,

       *Petitioner,*

*v.*

**RICKY DIXON**,

       *Respondent.*

_____/

## ORDER

Our Petitioner, Michael David Martinez, was found guilty in state court of attempted first-degree murder and discharging a firearm from a vehicle. *See* Judgment [ECF No. 9-1] at 34–39. For these crimes, he was sentenced to thirty years in prison. Martinez has now filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, challenging the constitutionality of his conviction and sentence. After careful review, we **DENY** Martinez's Petition on the merits.

### THE FACTS

The State of Florida charged Martinez by information with one count of attempted first-degree murder with a firearm (Count 1) and one count of discharging a firearm from a vehicle (Count 2). *See* Information [ECF No. 9-1] at 13–14. The State alleged that Martinez "got into the right rear passenger seat of a vehicle," drove alongside another vehicle—in which three people were riding—and then fired "numerous gunshots" into that other vehicle. Arrest Warrant Aff. [ECF No. 9-1] at 8. One of the victims, Jonathan Lopez, was shot twice in the leg, "shattering his femur bone." *Ibid.* Law enforcement recovered five ".380 caliber shell casings" from the crime scene, *id.* at 7, and later found a ".380 caliber Desert Eagle" in Martinez's possession, *id.* at 10.

Martinez's first trial began on October 5, 2015. *See* First Trial Tr. [ECF No. 10-1] at 1 (showing that jury selection began on October 5, 2015). At that trial, the following exchange took place between the State and one of its witnesses, Edwin Rodriguez:

> Q: Do you know a person by the name of Michael Martinez?
>
> A: Yes, I do.
>
> Q: How did you meet Michael Martinez?
>
> A: Through [Gregorio Candalario].
>
> [. . . .]
>
> Q: When you say you met Mr. Martinez through Gregorio Candalario, what do you mean by that?
>
> A: I mean basically Gregorio used to go to Michael to buy [w]eed.

*Id.* at 498–99. Hearing this answer, Martinez's defense lawyer immediately moved for a mistrial—which, because of the nature of the testimony, the trial court indicated it would grant. *See id.* at 499 ("[Defense Counsel]: [The witness] described [Martinez] just clear as a marijuana dealer. The Court: Sounded like it. He used to go to your client to buy [w]eed. If you want [the mistrial], I will give it to you, but, candidly, I think you better check with your client first to see if that is what he really wants."). After a brief pause in the proceedings, defense counsel confirmed that, after speaking to Martinez and his father, he "want[ed] a mistrial." *Id.* at 500. The state trial court promptly granted the mistrial and reset the case for a new trial. *See id.* at 502 ("I'm declaring a mistrial in this case, and I'm putting it back on the docket[.]").

On December 28, 2015, Martinez's lawyer filed a motion to dismiss the information on double-jeopardy grounds. *See* Motion to Dismiss [ECF No. 9-1] at 21–24. In that motion to dismiss, defense counsel advanced an interesting theory: The State (counsel argued) had *purposely* "asked [Rodriguez] how Candelario [sic] knew the Defendant" with the explicit goal of "goading and baiting the defense into requesting a mistrial," so that, at a later trial, the State would be permitted to introduce

2

some uncharged firearm conduct it *hadn't* been allowed to use at the first trial. *Id.* at 23–24. And it's true that, before the first trial, the state judge had "warned that [certain] evidence may not be admitted during the Defendant's trial because the State had not filed the appropriate Motion or Notice of their intent to use the material obtained from a Dade County arrest of the Defendant for which criminal charges were never filed." *Id.* at 22. After holding a hearing, the state court found that the prosecutor *hadn't* intentionally caused the mistrial and then denied the motion to dismiss. *See* Motion to Dismiss Hr'g Tr. [ECF No. 10-2] at 33 ("So, if your motion to dismiss is based on the fact that the prosecutor did something intentionally to gain an advantage, there's nothing before me to suggest that. So, in reference to that, your motion will be denied.").

On January 7, 2016, after a second trial, a jury found Martinez guilty of both counts. *See* Verdict [ECF No. 9-1] at 31–32. For these crimes, the state trial court sentenced Martinez to thirty years in prison on Count 1 and a concurrent fifteen-year sentence on Count 2. *See* Sentencing Orders [ECF No. 9-1] at 44–49. Martinez appealed his conviction and sentence to the Fourth DCA. *See* Direct Appeal Notice of Appeal [ECF No. 9-1] at 51. Martinez argued on direct appeal that the trial court had committed two errors: (1) that the trial court had improperly denied the motion to dismiss because "[t]he prosecutor's question was intended to elicit testimony which would necessitate the defense request for a mistrial," Direct Appeal Initial Brief [ECF No. 9-1] at 66; and (2) that the trial court should not have "allowed the prosecution . . . to introduce a gun over defense objection taken from the defendant in Miami Gardens approximately seven months after the shooting" because this firearm wasn't "inextricably intertwined" with the charged offense, *id.* at 67. On October 19, 2017, the Fourth DCA summarily affirmed the trial court in an unwritten opinion. *See Martinez v. State*, 232 So. 3d 1033, 1034 (Fla. 4th DCA 2017).

On November 14, 2018, Martinez, through counsel, filed a motion for postconviction relief under Fla. R. Crim. P. 3.850. *See* Postconviction Motion [ECF No. 9-1] at 100–41. In that motion,

Martinez argued that: (1) "counsel was ineffective for failing to investigate and present adequate mitigating evidence at sentencing," *id.* at 116; (2) "counsel was ineffective for moving for a mistrial during the first trial," *id.* at 119; (3) "counsel was ineffective for failing to adequately cross-examine [the victim] Jonathan Lopez to impeach him with his prior statements," *id.* at 124; (4) "counsel was ineffective for failing to adequately cross-examine Edwin Rodriguez to impeach his prior statements," *id.* at 128; (5) "counsel was ineffective for failing to object to Detective Schurkman's testimony and to the State's closing arguments, which violated . . . the Confrontation Clause," *id.* at 133; (6) "counsel was ineffective for failing to call a firearms expert to testify regarding the .38 caliber bullet that was recovered," *id.* at 136; and (7) "the cumulative effect of counsel's deficient performance prejudiced the defendant," *id.* at 140. The State filed a Response to the Postconviction Motion, contending that Martinez's claims were "conclusively refuted by the record and the law and must be summarily denied." State's Postconviction Response [ECF No. 9-3] at 37.

On November 1, 2021, the state postconviction court denied the Postconviction Motion. *See* Order Denying Postconviction Motion [ECF No. 9-6] at 154–61. Martinez appealed to the Fourth DCA, *see* Postconviction Notice of Appeal [ECF No. 9-10] at 14, which (on June 2, 2022) summarily affirmed the state postconviction court in an unwritten decision, *see Martinez v. State*, 339 So. 3d 983, 983 (Fla. 4th DCA 2022). The Fourth DCA's mandate issued on July 1, 2022. *See* Postconviction Mandate [ECF No. 9-10] at 18. Martinez filed this Petition on October 4, 2022. *See* Petition at 20.[1]

---

[1] "Under the 'prison mailbox rule,' a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." *Williams v. McNeil*, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009). "Absent evidence to the contrary, [courts] assume that a prisoner delivered a filing to prison authorities on the date that he signed it." *Jeffries v. United States*, 748 F.3d 1310, 1314 (11th Cir. 2014).

THE LAW

## I.      The Antiterrorism and Effective Death Penalty Act ("AEDPA")

AEDPA instructs district courts to deny any claim that was "adjudicated on the merits" in a state-court proceeding unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 97–98 (2011) (summarizing 28 U.S.C. § 2254(d)–(e)). To have "adjudicated [the claim] on the merits," the state court need not have issued any kind of formal opinion or even outlined its reasoning. *Id.* at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Rather, when a state court doesn't articulate its reasons for the denial, the federal court must "'look through' the unexplained decision to the last related state-court decision that does provide a rationale" and "then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). "Clearly established Federal law" means "the holdings, as opposed to the dicta, of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To be "contrary to clearly established federal law, the state court must either (1) apply a rule that contradicts the governing law set forth by Supreme Court case law, or (2) reach a different result from the Supreme Court when faced with materially indistinguishable facts." *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010) (cleaned up).

For "a state court's application of [Supreme Court] precedent" to be "'unreasonable, the state court's decision must have been more than incorrect or erroneous. The state court's application must have been objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003) (cleaned up). "[I]t

5

is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Richter*, 562 U.S. at 101. "And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (cleaned up).

Section 2254(d) similarly prohibits federal judges from reevaluating a state court's factual findings unless those findings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). To establish that a state court's factual findings were unreasonable, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155–56 (quoting 28 U.S.C. § 2254(e)(1)). "[E]ven if a petitioner successfully carries his burden under § 2254(e)(1)—showing by clear and convincing evidence that a particular state-court factual determination was wrong—he does not necessarily meet his burden under § 2254(d)(2): Even if the state court made a clearly erroneous factual determination, that doesn't necessarily mean the state court's 'decision' was 'based on' an 'unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022) (en banc) (quoting 28 U.S.C. § 2254(d)(2)). Indeed, habeas relief is not warranted "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an unreasonable determination of the facts and isn't based on any such determination." *Ibid.* (cleaned up).

"AEDPA's standard is intentionally difficult to meet." *Woods*, 575 U.S. at 315 (cleaned up). When reviewing state criminal convictions on collateral review, "federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 316 (cleaned up).

Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The *Brecht* harmless-error standard requires habeas petitioners to prove that they suffered "actual prejudice." *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1307 (11th Cir. 2012). As the Supreme Court recently explained, while the passage of AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht*'s actual-prejudice requirement. *Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022). In other words, a habeas petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 1526 ("[O]ur equitable precedents remain applicable 'whether or not' AEDPA applies." (citing *Fry v. Pliler*, 551 U.S. 112, 121 (2007)). In short, a "federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to *grant* relief, a court must find that the petition has cleared both tests." *Id.* at 1524 (emphasis in original); *see also Mansfield*, 679 F.3d at 1307 ("[A] habeas petition cannot be successful unless it satisfies both [AEDPA] and *Brecht*.").

## II.     AEDPA's Procedural Requirements

"[A] person in custody pursuant to the judgment of a State court" has one year to file a habeas petition in federal court. 28 U.S.C. § 2244(d)(1). That one-year period "runs from the latest of" the following dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)–(D). But this limitations defense is waivable. *See Paez v. Sec'y, Fla. Dep't of Corr.*, 947 F.3d 649, 655 (11th Cir. 2020) (explaining that the State may express its intent to "waive the limitations bar").

Beyond meeting this one-year window, though, federal habeas petitioners must also *exhaust* their claims by "*properly* present[ing] [them] to the state courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (emphasis in original). Specifically, federal habeas petitioners must "fairly present every issue raised in [their] federal petition to the state's highest court, either on direct appeal or on collateral review." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (cleaned up). "If a petitioner fail[ed] to 'properly' present his claim to the state court—by exhausting his claim[ ] and complying with the applicable state procedure—prior to bringing his federal habeas claim, then [§ 2254] typically bars [courts] from reviewing the claim." *Ibid*. In other words, where a petitioner has not "*properly* presented his claims to the state courts," the petitioner will have "procedurally defaulted his claims" in federal court. *O'Sullivan*, 526 U.S. at 848.

There are, to be sure, two exceptions to the general rule that a federal court may not consider a procedurally defaulted claim on the merits: "cause and prejudice" and "actual innocence." *Dretke v. Haley*, 541 U.S. 386, 393 (2004) ("[A] federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse

the default. We have recognized a narrow exception to the general rule when the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense."). A habeas petitioner can establish "cause and prejudice" if (1) "some objective factor external to the defense impeded the effort to raise the claim properly in the state court," and (2) "there is at least a reasonable probability that the result of the proceeding would have been different." *Harris v. Comm'r, Ala. Dep't of Corr.*, 874 F.3d 682, 688 (11th Cir. 2017). "Actual innocence," on the other hand, "applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted the petitioner.'" *McQuiggin v. Perkins*, 569 U.S. 383, 395 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). The petitioner bears the burden of establishing that one of these exceptions to the procedural-default rule applies. *See Gordon v. Nagle*, 2 F.3d 385, 388 (11th Cir. 1993) ("A defendant has the burden of establishing cause and prejudice."); *Arthur v. Allen*, 452 F.3d 1234, 1245 (11th Cir. 2006) ("The petitioner must support the actual innocence claim with new reliable evidence[.]" (cleaned up)).

All that said, "[s]tates can waive procedural bar defenses in federal habeas proceedings, including exhaustion." *Vazquez v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 964, 966 (11th Cir. 2016) (cleaned up). But "[a] State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, *expressly* waives the requirement." 28 U.S.C. § 2254(b)(3) (emphasis added); *see also McNair v. Campbell*, 416 F.3d 1291, 1304 (11th Cir. 2005) (same).

### III.    Ineffective Assistance of Counsel

The Sixth Amendment affords a criminal defendant the right to "the Assistance of Counsel for his defen[s]e." U.S. CONST. amend. VI. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, a habeas litigant must

demonstrate "that (1) his counsel's performance was deficient and 'fell below an objective standard of reasonableness,' and (2) the deficient performance prejudiced his defense." *Raleigh v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 938, 957 (11th Cir. 2016) (quoting *Strickland*, 466 U.S. at 687–88). This same standard applies to alleged errors made by both trial counsel and appellate counsel. *See Farina v. Sec'y, Fla. Dep't of Corr.*, 536 F. App'x 966, 979 (11th Cir. 2013) ("A claim of ineffective assistance of appellate counsel is evaluated under the same standard as for trial counsel.").

To establish the first prong (deficiency), "a petitioner must [show] that *no* competent counsel would have taken the action that his counsel did take[.]" *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) (emphasis added). So, if "some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial[,]" counsel could not have performed deficiently. *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) (quoting *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992)).

As for the second prong (prejudice), "a defendant is prejudiced by his counsel's deficient performance if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. To succeed on this prong, a defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

## ANALYSIS

In his Petition, Martinez advances two grounds for relief. *First*, he contends that the state trial court violated the Double Jeopardy Clause when it denied his lawyer's motion to dismiss. Here, Martinez says that jeopardy attached after his first trial because the State had deliberately provoked a mistrial. *See* Petition at 16–17 ("The defendant should not have been subject to a second trial under

the objective facts and circumstances as the mistrial was meant to give the prosecution a better chance of conviction that would have been unlikely before the original trial judge . . . . The prosecutors' question was intended to elicit testimony which would necessitate the defense request for a mistrial [and] a retrial by another judge[.]"). *Second*, Martinez claims that his trial counsel was ineffective for failing to object to a supplemental ballistics report submitted by Erica Lawton on the ground that "Lawton had tampered with [Alan Greenspan's] original report adding supplemental of her own, failing to disclose the projectile from the .38 caliber." *Id.* at 18–19 (errors in original). We'll address— and reject—each ground in turn.

## I.     Ground One

In Ground One of the Petition, Martinez resuscitates the same argument his lawyer had raised in the motion to dismiss—that the State had orchestrated the mistrial "so as to afford the prosecution a more favorable opportunity to convict" Martinez at a second trial. Petition at 17. Martinez adds that the prosecutors and the original trial judge didn't get along—which Martinez sees as further proof of the State's interest in getting the case kicked to a different judge. *See id.* at 16 ("Within days after the mistrial & after the prosecutors complaining of her treatment by Judge Destry, the case was removed from Judge Destry & reassigned to another judge?" (errors in original)). The Respondent maintains that "there are no objective facts that Respondent goaded defense counsel to request a mistrial," and that (in any event) we should defer to the state court's finding that the record revealed no "prosecutorial intent" to cause a mistrial. Response to Order to Show Cause ("Response") [ECF No. 8] at 18–19.[2]

---

[2] The Respondent concedes that Ground One is timely, *see* Response at 7 ("Accordingly, Petitioner's first claim falls within the statute of limitations[.]"), and that it has been fully exhausted, *id.* at 9 ("Thus, it appears [Ground One] was fairly presented before the state court and is properly exhausted."). So, we'll dive straight into the merits of this claim.

Because this claim was "adjudicated on the merits in State court proceedings," our only task is to determine whether the state court's decision was "reasonable." 28 U.S.C. § 2254(d). Martinez bears the burden "to demonstrate that there was no reasonable basis for the decision of [the state court] to deny his claim." *Tarleton v. Sec'y, Fla. Dep't of Corr.*, 5 F.4th 1278, 1291 (11th Cir. 2021). In assessing the reasonableness of this decision, we look to the "highest state court" that reached the merits of the claim. *Newland v. Hall*, 527 F.3d 1162, 1199 (11th Cir. 2008). In our case, the Fourth DCA affirmed the state court's decision to deny Martinez's motion. *See Martinez*, 232 So. 3d at 1034. But, since the Fourth DCA didn't issue a "decision on the merits in a reasoned opinion," we "look through" that summary affirmance to the "last related state-court decision that does provide a relevant rationale." *Wilson*, 138 S. Ct. at 1192. Although the trial court never entered a written order denying Martinez's motion to dismiss, it orally denied the motion after a hearing and articulated its reasoning on the record. *See generally* Motion to Dismiss Hr'g Tr. [ECF No. 10-2] at 23–33. "Since the trial court held a [hearing] on this issue—and then denied [the] claim on the merits—we presume that the Fourth DCA adopted the trial court's [oral] findings." *Renford v. Dixon*, 2022 WL 2046849, at *8 (S.D. Fla. June 7, 2022) (Altman, J.) (citing *Wilson*, 138 S. Ct. at 1192). Our question, then, is whether the state trial court's decision to deny the motion to dismiss was reasonable.

"The Double Jeopardy Clause of the Fifth Amendment protects a defendant in a criminal proceeding against multiple punishments or repeated prosecutions for the same offense." *United States v. Dinitz*, 424 U.S. 600, 606 (1976). The Double Jeopardy Clause, however, doesn't necessarily "offer a guarantee to the defendant that the State will vindicate its societal interest in the enforcement of the criminal laws in one proceeding." *Oregon v. Kennedy*, 456 U.S. 667, 672 (1982). Because mistrials happen for any number of (unforeseen) reasons, jeopardy will attach after a mistrial *only* in specific circumstances. If a mistrial is granted over the defendant's objection, jeopardy is presumed to attach unless "'there was a manifest necessity for the mistrial, or the ends of public justice would otherwise

have been defeated' by continuing the trial." *United States v. Chica*, 14 F.3d 1527, 1531 (11th Cir. 1994) (quoting *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824) (cleaned up)). If, on the other hand, *the defendant* requests a mistrial, jeopardy *doesn't* attach unless the "mistrial results from governmental conduct that 'is intended to goad the defendant into moving for a mistrial[.]'" *United States v. Shelley*, 405 F.3d 1195, 1200 (11th Cir. 2005) (quoting *Kennedy*, 456 U.S. at 676). The Supreme Court has emphasized that this second exception is extremely limited: The Defendant must show that "the Government actually *intended* to prove a mistrial" and cannot rely on a prosecutor's "overreaching" or "bad faith" during the trial. *Ibid.* (citing *Kennedy*, 456 U.S. at 674–76).

We think the state court got this one right—which is to say, that the state trial court's decision to deny Martinez's motion to dismiss was a "reasonable application" of "clearly established Federal law" based on a reasonable "determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1)–(2). During her direct examination of Edwin Rodriguez, the prosecutor asked some basic questions about how Rodriguez knew Martinez (*e.g.*, "Do you know a person by the name of Michael Martinez?" and "How did you meet Michael Martinez?"). First Trial Tr. [ECF No. 10-1] at 498. When Rodriguez claimed that he had met Martinez through another person (Gregorio Candalario), the prosecutor followed up with what appeared to be another innocuous question: "When you say you met Mr. Martinez through Gregorio Candalario, what do you mean by that?" *Ibid.* Unfortunately, the State's question prompted Rodriguez to say that Martinez had sold marijuana. *See ibid.* ("I mean basically Gregorio used to go to Michael to buy [w]eed."). This prejudicial revelation to the jury—that Martinez might have sold drugs—is what triggered Martinez's counsel to move for the mistrial. *See id.* at 500 ("The Court: Are we going forward on a mistrial? [Defense Counsel:] I want a mistrial."); *cf. Valderrama v. State*, 816 So. 2d 1143, 1144 (Fla. 4th DCA 2002) ("[G]enerally[,] implicating a defendant in other crimes is presumptively prejudicial[.]"). And, as we've said, jeopardy typically wouldn't attach in these circumstances because *the defense* requested the mistrial. *See United States v. Scott*, 437 U.S. 82,

93 (1978) ("[A motion for mistrial] by the defendant is deemed to be a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact.").

In Martinez's view, though, there's much more to this story. As he sees it, the prosecutor's questions were *deliberately* "intended to elicit testimony which would necessitate the defense request for a mistrial[.]" Petition at 16–17; *see also* Motion to Dismiss [ECF No. 9-1] at 24 ("The prosecutor knew what [Rodriguez's] answer would be to the question she asked. By intentionally goading and baiting the defense into requesting a mistrial, she got a new trial judge and time to file her motion."). To prove that the prosecutor acted intentionally, Martinez points to the supposed breakdown in the relationship between the judge and the prosecutors. *See* Petition at 16 ("The judge repeatedly warned the prosecution that the [prior bad act] evidence would not be coming in & voiced his frustration [with the prosecutor] . . . . Within days after the mistrial & after the prosecutors complaining of her treatment by Judge Destry, the case was removed from Judge Destry & reassigned to another judge[.]").

But Martinez hasn't adduced any evidence for his view that the prosecutor *intentionally* caused a mistrial—let alone that the state court's finding was unreasonable. After holding a hearing on Martinez's motion, remember, the trial court unequivocally found that the State *hadn't* acted intentionally:

> Having said that, I was not present for the motion for mistrial; knew nothing about it. I don't have anything in front of me where a record would reflect that the prosecutor intentionally caused the trial. It's my understanding from hearing what you said that you asked for the mistrial. . . . Having said that, I [also] don't think you get to choose [which judge] you get to be in front of in the random selection of things. So, if your motion to dismiss is based on the fact that the prosecutor did something intentionally to gain an advantage, there's nothing before me to suggest that. So, in reference to that, your motion will be denied.

Motion to Dismiss Hr'g Tr. [ECF No. 10-2] at 32–33.

Because this factual finding is "presumed to be correct," Martinez bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1);

*see also Ward*, 592 F.3d at 1177 ("[W]e must presume the state court's factual findings to be correct unless the petitioner rebuts that presumption by clear and convincing evidence. Clear and convincing evidence entails proof that a claim is 'highly probable,' . . . . The Supreme Court described this standard as 'demanding but not insatiable[.]'" (quoting *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005))). Rather than produce some evidence to rebut the state court's findings, Martinez simply regurgitates the same-old speculative inferences—*i.e.*, the trial judge's pretrial firearm ruling and the supposed acrimony between the prosecutor and the judge—the state courts have already rejected. That's just not good enough to show, *by clear and convincing evidence*, that the prosecutor "actually intended to provoke a mistrial and thereby 'subvert the protections afforded by the Double Jeopardy Clause.'" *Shelley*, 405 F.3d at 1200 (quoting *Kennedy*, 456 U.S. at 676); *see also Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985) ("Speculation is insufficient to carry the burden of a habeas corpus petition[.]"); *United States v. Jamison*, 505 F.2d 407, 412 n.8 (D.C. Cir. 1974) ("Appellants offer several possible prosecutorial motives for provoking a mistrial and ask us to infer from these a 'preconceived plan' to do so. We would be extremely reluctant to draw such an inference without more direct evidence even if we were persuaded that a strong motive existed to seek a mistrial[.]"). Since we have *no* evidence that the prosecutor purposely incited a mistrial, the state postconviction court reasonably concluded that jeopardy hadn't attached after Martinez's first trial.

But here's the thing: Even if we were willing to ignore § 2254(e)(1)'s deferential standard (which we're not), we'd still reject this claim because Martinez's theory—that, having grown tired of the trial judge's rulings, the prosecutor decided to play for a mistrial—is conclusively belied by the record. Martinez's story, recall, begins with the State's attempt to introduce a .380 caliber Desert Eagle pistol that was found on Martinez's person after officers responded to an unrelated incident in Miami Gardens, Florida. *See* Notice of Intent to Use Inextricably Intertwined Evidence [ECF No. 9-1] at 16–17 ("Upon arrival, a witness notified police that the Defendant had thrown something near a trash

bin. Officers found a work glove with suspected 'fresh' blood on it. Inside the glove was a small firearm."). Ballistics testing on the Desert Eagle later revealed that it was *the same gun* someone had used in the shooting at issue in our case. *See id.* at 17 ("Ballistics testing was done on the firearm and compared to the shell casings collected from the October 17, 2012 crime scene. [Examiners] determined that the shell casings from October 17, 2012 were fired from the same gun found on April 3, 2013.").

During the first trial, the prosecutor asked the lead detective, Lance Schurkman, *how* law enforcement had recovered Martinez's firearm:

Q: Eventually did you find out that Michael Martinez was taken into custody on your warrant?

A: Yes, ma'am.

Q: Later you received additional evidence as it relates to your case, comes out of Miami Dade?

A: Yes, ma'am.

Q: What evidence was brought to your attention from officers from the Miami Gardens Police Department?

A: There was a recovered Desert Eagle 380 caliber firearm that was recovered in an incident that occurred down there.

Q: Okay. After that firearm was recovered, how do they then—could you explain how the department finds out that the gun relates back to what appears to be your case?

A: Okay. The police department down there in Miami Gardens, they didn't know about my case. I came across their case because a suspect, Mr. Martinez, was developed in my investigation. When I checked to see if there was [sic] any prior incidents, there was this Miami Gardens incident.

First Trial Tr. [ECF No. 10-1] at 377. At this point, the trial court *sua sponte* paused the proceedings, and Martinez's lawyer objected. *See id.* at 378. Defense counsel argued that Detective Schurkman's

testimony was improper "*Williams* Rule evidence without *Williams* Rule notice."[3] The prosecutor responded that "I wasn't going there" and insisted that she only intended to introduce evidence that "the firearm was recovered out of Miami Gardens[.]" *Id.* at 378–79. Having thus heard from both sides, the court found the objection premature (since no *Williams* Rule evidence had come out), but warned the prosecutor not to elicit more information about the firearm:

> [Defense Counsel:] I think [what the State is] trying to do is get *Williams* Rule testimony of another crime.
>
> The Court: Well that hasn't happened yet. And it is not going to. Apparently the state has advised they are not going to put on any testimony with regard to what happened in Miami Gardens.
>
> [. . . .]
>
> [Defense Counsel:] I don't think that they get away with it by calling [it] an incident with Miami Gardens Police, down in Miami, where we recover a gun. And what happens is they are trying to circumvent [the *Williams* Rule requirements.]
>
> The Court: Okay. Well, all that has been said at this point was that the detective has testified that the defendant was a suspect, and he ran across this case down in Miami. And that is when it stopped.
>
> [Defense Counsel:] And Miami Gardens Police took into custody a gun out of this incident.
>
> The Court: Yes. I would agree with that.
>
> [Defense Counsel:] But you can't mislead a jury. . . . My client is supposed to be in Miami Gardens, highly intoxicated.
>
> The Court: None of that is coming before the jury, Mr. Curry, unless you put it there.
>
> [Defense Counsel:] Well, I think it is already there.

---

[3] Under Florida law, "evidence of other crimes, wrongs, or acts" that are "factually similar or dissimilar to the charged crime" is known as "*Williams* Rule evidence" and is generally considered inadmissible unless "it casts light on a material fact in issue other than the defendant's bad character or propensity." *Williams v. State*, 621 So. 2d 413, 414 (Fla. 1993). As with our Rule 404(b), state law requires the prosecution to provide *advance notice* of its intent to introduce *Williams* Rule evidence at trial. *See Robertson v. State*, 829 So. 2d 901, 907 (Fla. 2002) ("[FLA. STAT.] § 90.404(2)(b)(1) also requires the State to file a notice of intent to rely on evidence of a defendant's prior misconduct.").

The Court: *I disagree with you.* At this point all that has been testified to is that there was an incident in Miami Gardens [in] which a firearm was recovered. That this detective ran across that incident because the defendant was somebody he was—he had developed as a suspect and that is it. There has been no mention of what the defendant's potential involvement was in that [Miami Gardens] incident, nothing of the [kind].

[. . . .]

[Defense Counsel:] You know, I don't want the stuff to come in and I think [it] might be we are already there. I don't know how to deal with it now. But, anyway, you noted my objection.

The Court: Okay. Objection is noted at this point. Ms. Hawkins [the prosecutor], you are on thin ice here.

Ms. Hawkins: I understand.

*Id.* at 380–82 (emphasis added). And, of course, the trial court never had a chance to address this evidentiary issue again because it declared a mistrial the next morning. *See id.* at 502.

The upshot is that Martinez doesn't quite have the facts right. Although (it's true) the original trial judge wasn't going to let the State introduce *Williams* Rule evidence about the Miami Gardens incident, he still *overruled* defense counsel's objection and allowed Detective Schurkman to testify "that there was an incident in Miami Gardens [where] a firearm was recovered." *Id.* at 382. And, by the way, that's all the State ever wanted. As we've seen, the State (by its own admission) wasn't trying to introduce any *Williams* Rule evidence; it just wanted the jury to have some context about where and when the gun was found. *See id.* at 379 ("The Court: And you don't intend on having the detective testify as to anything that happened in Miami Gardens? [Prosecutor]: Not in [this] case, no. The Court: So strictly that the firearm was recovered out of Miami Gardens? [Prosecutor]: That is it."). Since the original judge thus gave the State exactly what it wanted—and excluded only the *Williams* Rule evidence the State wasn't interested in anyway—Martinez is wrong to suggest that, because of this ruling, the State had some incentive to provoke a mistrial. *See* Petition at 16 ("The defense raised the issue regarding the Miami Gardens incident which led to the recovery of a gun that was found

inadmissible based on the state's failure to file a notice of intent to offer 'inextricably intertwined evidence' at trial[.]").[4]

Because Martinez has produced no evidence for his view that the State purposely caused a mistrial, we conclude that the state court reasonably applied federal law when it denied his motion to dismiss. *See United States v. Serra*, 882 F.2d 471, 473 (11th Cir. 1989) ("[N]othing in the record suggests that the [prosecutor's] error was calculated to provoke Serra into moving for a mistrial, nor indeed can we divine a probable motive for the prosecutor to seek an untimely end to the first trial. Thus, Serra's double-jeopardy claim fails."). We therefore **DENY** Ground One.

## II.    Ground Two

In Ground Two, Martinez alleges that "counsel was ineffective in failing to realize that the state supplemented the report of [the] expert firearm examiner" with the findings of another expert who (Martinez claims) "tamper[ed] with [the] evidence." Petition at 7. Martinez goes on to explain that the original ballistics report (authored by Alan Greenspan) "shows five casings from a .380 caliber [firearm] and one .38 special caliber projectile found at the exact same location of the crime scene," which (Martinez says) *could* suggest that there were "two guns at the scene[.]" *Id.* at 18. Martinez now claims that the State enlisted another crime-scene technician, Erica Lawton, to "tamper[ ] with Greenspan's original report [by] adding a supplemental [sic] of her own, failing to disclose the projectile from the .38 caliber." *Id.* at 18–19. And Martinez blames his lawyer for having failed to object to Lawton's (allegedly) fraudulent supplemental report. *See id.* at 19 ("Counsel's failure in

---

[4] Martinez appears to take issue with the state court's decision to admit the gun as inextricably intertwined with the charged offense. *See* Petition at 15–16 (arguing that "the Miami Gardens incident which led to the recovery of the gun . . . was inadmissible based on the state's failure to file a notice of intent to offer 'inextricably intertwined evidence' at trial"). But he can't use a federal habeas petition to collaterally attack a state court's evidentiary rulings. *See McCullough v. Singletary*, 967 F.2d 530, 535 (11th Cir. 1992) ("A state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved.").

overlooking the supplemental report so altered the defense, that the error undermined the confidence in the outcome.").

The Respondent counters that Ground Two is "time-barred" and "has not been exhausted." Response at 7, 10.[5] Conceding that Ground Two "was not presented in State court," Martinez now asks us to grant him relief anyway under the exhaustion exception the Supreme Court carved out in *Martinez v. Ryan*, 566 U.S. 1 (2012). *See* Petition at 19. But, because we can deny Ground Two on the merits—and on *de novo* review—we'll "skip over the procedural default analysis" and consider the merits of this claim. *Dallas v. Warden*, 964 F.3d 1285, 1307 (11th Cir. 2020); *see also Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can, however, deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review[.]").

There are at least two major flaws with Ground Two. *First*, neither the State nor Ms. Lawton "tampered with" (or otherwise ignored) Mr. Greenspan's original report. Both Mr. Greenspan's original report *and* Ms. Lawton's supplemental report were admitted into evidence as State's Exhibit No. 11. *See* Second Trial Tr. [ECF No. 10-3] at 411 ("[Ms. Lawton]: This [exhibit] consists of the original report that was written by Allen Greenspan and then my supplemental report that was written by myself."); *see also* Ballistics Report [ECF No. 9-6] at 150–51. The jury thus had access to Mr.

---

[5] Although we won't address the Respondent's exhaustion argument, we reject the Respondent's contention that Ground Two is "time-barred." Response at 7. As the Respondent concedes, Martinez's Petition is timely because Martinez filed it *before* one year of untolled time had elapsed from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review[.]" 28 U.S.C. § 2244(d)(1)(A); *see also* Response at 6 ("Consequently, it appears that Petitioner's untolled time totals 342 days[.]"). And so, while Martinez *may* have failed to raise Ground Two in state court, that failure presents an exhaustion problem—not a timeliness issue. *See* 28 U.S.C. § 2254(b)(1)(A) ("An application for writ of habeas corpus . . . shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State[.]"); *see also Zack v. Tucker*, 704 F.3d 917, 926 (11th Cir. 2013) (en banc) ("Accordingly, we hold that the statute of limitations in AEDPA applies on a claim-by-claim basis *in a multiple trigger date case*." (emphasis added)).

Greenspan's unedited conclusion that one of the projectiles found at the crime scene was a ".38 caliber class bullet." Ballistics Report [ECF No. 9-6] at 150.[6] Indeed, Martinez's defense lawyer harped on Mr. Greenspan's findings in his closing argument. *See* Second Trial Tr. [ECF No. 10-3] at 479–80 ("[Defense Counsel:] Projectile A is a .38—*This is Greenspan's report*. Projectile A is a .38-caliber class bullet. . . . I don't know. To me, a .38 is what you put in a revolver, Smith and Wesson, a snubby, a detective kind of revolver, not a .380." (emphasis added)). In any event, nothing in Ms. Lawton's report contradicted anything Mr. Greenspan had written. Ms. Lawton had simply "peer reviewed the work done in this case by Mr. Greenspan," *id.* at 382, and her supplemental report was only necessary because, after Mr. Greenspan retired, she was called in to testify in his place. But "she [couldn't] testify as to operability of the firearm that [Mr. Greenspan] did. So, she had to retest the operability of the firearm in order to testify in court about the operability." *Ibid.* That's really it. Martinez's trial counsel thus *couldn't* have performed deficiently by failing to argue that Ms. Lawton "was hiding the truth by failing to disclose the key element regarding the bullet or projectile from the .38," Petition at 19, *both* because Ms. Lawton didn't "change" any of Greenspan's findings *and* because Greenspan's unaltered report—which included this "key element"—was admitted into evidence for the jury to consider *and* was explicitly referenced by defense counsel during his closing argument. *Cf. Freeman v. Att'y Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim[.]").[7]

---

[6] Martinez (of course) conveniently ignores the *other* half of Greenspan's conclusion, which is that a .38 caliber bullet "is the type of bullet that is normally loaded in .380 Auto cartridges, and was fired in [Martinez's Desert Eagle pistol]." Ballistics Report [ECF No. 9-6] at 150. Greenspan, in short, didn't help Martinez's defense at all.

[7] Martinez arguably raises a second claim in Ground Two: that he "would have considered a plea agreement" if he had known that "the second expert changed the [ballistics] analysis[.]" Petition at 19. Of course, Ms. Lawton didn't "change" anything in Greenspan's report—and the jury heard all about Greenspan's findings—so there's no reason for us to believe that Martinez would have pled guilty. *See Diaz v. United States*, 930 F.2d 832, 835 (11th Cir. 1991) ("[The defendant's] after the fact testimony concerning his desire to plead, without more, is insufficient to establish that but for counsel's alleged advice or inaction, he would have accepted the plea offer.").

*Second*, even if Martinez's defense lawyer had been deficient, Martinez's claim would still fail because he hasn't shown that he was prejudiced by that (alleged) ineffectiveness. To establish prejudice under *Strickland*, a criminal defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. But "overwhelming evidence of [the defendant's] guilt" usually precludes the defendant from meeting his burden because "an error by counsel does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d 1278, 1300 n.9 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 691) (cleaned up); *see also Ravelo v. Dixon*, 2023 WL 2837072, at *18 (S.D. Fla. Apr. 7, 2023) (Altman, J.) ("Ravelo suffered no prejudice because, given the overwhelming evidence of Ravelo's guilt, the unobjected-to statement had (at most) a negligible impact on the outcome of the trial.").

The gravamen of Ground Two is that Ms. Lawton's report obfuscated the fact that a .38 caliber bullet was found at the crime scene—a fact that (Martinez alleges) is "proof" that another gun (and thus, perhaps, another shooter) was involved in the crime. *See* Petition at 18 ("It is undisputable that a .38 caliber [bullet] is almost twice the size of a .380 caliber [bullet] in length & width which leads to the possibility of two guns at the crime scene which was overlooked[.]" (errors in original)). But Martinez has no evidence for this proposition. Indeed, as we've hinted, Greenspan *himself* contradicted this assertion when he opined that a .38 caliber bullet *could* have been fired from the .380 caliber pistol the police found in Martinez's possession. *See* Ballistics Report [ECF No. 9-6] at 150. In any event, there's *no* dispute that the five *other* casings police found at the scene came from *Martinez's* .380 Desert Eagle. *See ibid.* (finding that all five casings "are .380 Auto caliber fired cartridge cases" that were fired from Martinez's Desert Eagle pistol). And that's important because, under Florida law, Martinez would face the same penalties whether he acted alone or in combination with others. *See* FLA. STAT. § 777.011 ("Whoever commits any criminal offense against the state . . . or aids, abets, counsels, hires,

or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such[.]"); *Lovette v. State*, 636 So. 2d 1304, 1306 (Fla. 1994) ("Felons, however, are generally responsible for the acts of their co-felons. . . . One who participates with another in a common criminal scheme is guilty of all crimes committed in furtherance of that scheme[.]" (cleaned up)).

But there's so much more. The victim clearly and unambiguously identified Martinez (and no one else) as the shooter. *See* Second Trial Tr. [ECF No. 10-3] at 42 ("Q: Okay. As you sit here today, you are able to testify as to who you saw come into the Mobil gas station. Is that correct? A: Yes. . . . Q: Do you see that person in the courtroom today? A: Yes. . . . Q: Is there any doubt in your mind that the same person that came into the store, wearing the hat, is the person that's wearing the hat in the backseat of the car? A: I don't have any doubts."). Another witness, Edwin Rodriguez, testified that he was with Martinez at the gas station and that he *also* saw Martinez shoot the victim. *See id.* at 170–71 ("Q: You said you all get in the car and Mr. Martinez is upset. A: Correct. Q: Okay. What is he doing? Is he yelling? A: Oh, yeah. He's yelling. You know, he wants to get out [of] the car. . . . Q: When you say you drive around—or [Gregorio Candalerio] drives around, explain to the jury what you mean. . . . A: He pulls in just for Michael to vent. And then that's when he shoots the gun. Q: Okay. That's when who shoots the gun? A: Michael.").[8] And this testimony was all corroborated by video footage of the entire incident, which showed that "the [person] who came into the store wearing the hat"—whom both the victim and Rodriguez identified as Martinez—was sitting (as Rodriguez said) in the passenger seat of the vehicle that drove by the victim when he was shot. *See id.* at 188 ("Q:

---

[8] Detective Schurkman testified that he interviewed another person who was with Martinez that night, Gregorio Candalerio, who *likewise* confirmed that Martinez (and no one else) had shot the victim. *See* Second Trial Tr. [ECF No. 10-3] at 321–22 ("[Det. Schurkman]: I did meet with Gregorio Cand[a]lario and got a statement from him. . . . [A]t that point both [Candalerio and Martinez] gave up the name of Michael Martinez as the other person in the video."). Unfortunately, for whatever reason, Mr. Candalerio was unavailable to testify at trial.

What's happening at this point? [Rodriguez:] That's when Greg pulls up. Q: Okay. A: And Michael—like—out. And that's when he shoots the gun."); *see also* Surveillance Footage [ECF No. 9-6] at 93–139. Given this overwhelming evidence of Martinez's guilt, there's no "reasonable probability" that counsel's objection to Lawton's supplemental ballistics report would have had any effect on the outcome of Martinez's trial. *See Strickland*, 466 U.S. at 694.

We thus **DENY** Ground Two.

## EVIDENTIARY HEARING

We won't hold an evidentiary hearing in this case. "[W]hen the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary hearing.'" *Cullen v. Pinholster*, 563 U.S. 170, 183 (2011) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)). Based on what we've said—including and especially the presence of a robust trial and state-postconviction record—we don't think we'd benefit from any further factual development in this case.

## CERTIFICATE OF APPEALABILITY

A Certificate of Appealability ("COA") is appropriate only when the movant makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To deserve a COA, therefore, the movant must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "Where a district court has disposed of claims . . . on procedural grounds, a COA will be granted only if the court concludes that 'jurists of reason' would find it debatable both 'whether the petition states a valid claim of the denial of a constitutional right' and 'whether the district court was correct in its procedural ruling.'" *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001) (quoting *Franklin v. Hightower*, 215 F.3d 1196, 1199 (11th Cir. 2000)). Jurists of reason wouldn't debate our assessment of Martinez's constitutional claims, so we'll **DENY** any request for a COA.

* * *

Having carefully reviewed the record and the governing law, we hereby **ORDER AND ADJUDGE** that the Petition [ECF No. 1] is **DENIED**, that a COA is **DENIED**, that any request for an evidentiary hearing is **DENIED**, that all deadlines are **TERMINATED**, and that any pending motions are **DENIED** as moot. The Clerk shall **CLOSE** this case.

**DONE AND ORDERED** in the Southern District of Florida, on July 10, 2023.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:   Michael David Martinez, *pro se*
       counsel of record

25